907 A.2d 845

**Frederick GREEN**

v.

**CARR LOWERY GLASS COMPANY, INC.**

**No. 0990, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 15, 2006.

Joan P. Adelman, Towson, for appellee.

David E. Fink, Baltimore, for Appellant.

Panel: HOLLANDER, ADKINS, and SHARER, JJ.

**504**

SHARER, Judge.

In this appeal we shall construe several provisions of the Maryland Code relating to disablement and entitlement to workers' compensation benefits resulting from hearing impairment. Judicial review of an order of the Workers' Compensation Commission was sought in the Circuit Court for Baltimore City by Frederick Green, appellant. Cross motions for summary judgment were filed by appellant, and by his employer, Carr Lowery Glass Company, and its insurer, the Injured Workers' Insurance Fund, appellees (collectively "the employer").

Following a hearing, the circuit court granted the employer's motion for summary judgment, thus giving rise to this appeal in which appellant asks: [1]

1. Is a claimant whose hearing has been damaged as a result of his occupation, and who meets the criteria for benefits under LE § 9–505, entitled to have hearing aids provided by the employer and insurer, despite the fact that he does not meet the criteria of LE § 9–650? [2]

For the reasons that follow, we affirm the judgment of the circuit court.

## FACTUAL and PROCEDURAL BACKGROUND

The material facts in this case are not disputed, thus we recount them only to the extent necessary to resolve the legal issue presented.

---

1. We have rephrased appellant's question for clarity. In his brief, he asks:

 I. IS A CLAIMANT WHOSE HEARING HAS BEEN DAMAGED AS A RESULT OF HIS OCCUPATION AND MEETS THE CRITERIA FOR BENEFITS UNDER § 9–505 OF THE LABOR AND EMPLOYMENT ARTICLE OF THE ANNOTATED CODE OF MARYLAND, ENTITLED TO HAVE HEARING AIDS PROVIDED BY THE EMPLOYER INSURER, DESPITE THE FACT THAT THEY [SIC] ARE NOT ENTITLED TO MONETARY BENEFITS UNDER THE FORMULA PROVIDED BY THE LABOR AND EMPLOYMENT ARTICLE § 9–650.

2. Unless indicated otherwise, all citations are to L.E. Title 9.

On August 3, 2004, appellant, employed by Carr Lowery Glass Company as a mold shop worker for more than 30 years, filed a notice of employee's claim for workers' compensation benefits. Appellant asserted a date of disablement of February 25, 2003,[3] alleging that "years of exposure to loud glass machine(s) caused loss of hearing." On October 19, 2004, a hearing evaluation was performed, at appellant's request, by Brian Kaplan, M.D., a physician affiliated with Ear, Nose & Throat Associates. Dr. Kaplan provided the following evaluation of appellant's condition:

> [Appellant] does have a mild to severe high frequency sensorineural hearing loss. *His Maryland Compensation Formula for hearing loss is zero percent.* However, this pattern of hearing loss is consistent with that caused by significant noise exposure. This noise exposure and hearing loss is likely also the cause of the factors for his bilateral tinnitus. He is a good hearing aid candidate given the degree of loss and discrimination scores. The cost of hearing aids is $5125.00. I have recommended good hearing protection [in] the future when in loud environments and will plan seeing him back on an as needed basis.

(Emphasis added).

Of importance to appellant's claim was that although the compensation formula computation compiled by Dr. Kaplan indicated that appellant suffered zero percent hearing loss under the Maryland Workers' Compensation formula, appellant did suffer some hearing loss within the frequencies of the 2000 and 3000 hertz range.

Following a hearing on appellant's claim, the Commission passed an order on February 10, 2005, denying compensation. The Commission found "on the issues presented that [appel-

---

**3.** With regard to the timing of his claim, appellant alleged in his brief to this Court that "[o]n or about February 25, 2003, the Claimant/Appellant first became aware that his co-workers had also been suffering from hearing problems and they were being informed by medical doctors that their hearing problems were a result of long term exposure to loud noise." There are no issues of limitations in this case. *See, e.g., Yox v. Tru–Rol Co.,* 380 Md. 326, 844 A.2d 1151 (2004).

lant] did not sustain an occupational disease of binaural hearing loss arising out and in the course of employment as alleged to have occurred February 25, 2003...." On February 17, 2005, appellant filed a petition for judicial review.

The circuit court held a hearing on May 27, 2005, in order to entertain the parties' opposing motions for summary judgment. Thereafter, the court issued an oral opinion:

THE COURT: So I think again, inferring the legislative intent as best as I can, it is that a threshold has to be met before there's a right to medical benefits, and to the extent I can discern any other legislative intent, I look at 9–660 as it currently exists, and for whatever it's worth, it says "compensable hernia." Again, some intent indicated that in order to get medical services, you have to be within the threshold established by the Act.

So my view is you do have to meet the threshold under 101–25A, now codified in 9–650, in order to be entitled to medical benefits. And certainly, if I were writing the Workers Compensation Statute, it would seem rational to me to provide for medical services for someone suffering hearing loss as a result of his or her employment, regardless of whether it met the threshold.

However, I think the principle that ambiguities in the statute should be construed in favor of the Claimant, which certainly is an unarguable principle, only goes so far. And I think that the legislative intent from what I've been able to determine, although when I say, I guess it requires close reading to determine it, that doesn't necessarily mean that, I don't think the principle of construing the statute in favor of the Claimant means that you hold everything in favor of the Complainant even if you think the legislative intent was to the contrary.

So I believe that it is required that the Claimant meet the standard of 9–650 before being entitled to medical benefits, and for that reason, it being entirely a question of law, as the parties agree, I'm going to grant the Employer/Insur-

er's Motion for Summary Judgment, and I'm going to deny the Claimant's Motion for Summary Judgment.

The court's bench opinion was followed on May 31, 2005, by a written order which granted summary judgment in favor of the employer, denied appellant's motion for summary judgment, and affirmed the decision of the Commission. Appellant's timely appeal followed.

## Standard of Review

Summary judgment may be granted "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f). Further,

> [w]e review a circuit court's order granting summary judgment *de novo*. We determine whether there is any dispute of material fact, and, if there is none, we then determine whether the court was legally correct in its ruling. As we undertake this review, " 'we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party.' " " 'We ordinarily will uphold the grant of summary judgment only on a ground relied on by the trial court.' "

*Stanley v. Am. Fed'n of State & Mun. Employees Local No. 553*, 165 Md.App. 1, 13, 884 A.2d 724 (2005) (citations omitted).

Our standard is further refined by the requirement that "[a]ppellate review of a summary judgment [be] limited to the issue of whether the trial court was 'legally correct.' " *Honeycutt v. Honeycutt*, 150 Md.App. 604, 612 n. 4, 822 A.2d 551 (2003); *see also A.J. Decoster Co. v. Westinghouse*, 333 Md. 245, 261, 634 A.2d 1330 (1994). Further, "[w]hen both sides file cross motions for summary judgment, as in the present case, the judge must assess each party's motion on its merits, drawing all reasonable factual inferences against the moving party." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md.

**508**

261, 278, 825 A.2d 995 (2003)(citing *Taylor v. NationsBank, N.A.*, 365 Md. 166, 174, 776 A.2d 645 (2001)).

## DISCUSSION

1. Is a claimant whose hearing has been damaged as a result of his occupation, and who meets the criteria for benefits under LE § 9–505, entitled to have hearing aids provided by the employer and insurer, despite the fact that he does not meet the criteria of LE § 9–650?

### *Principles of Statutory Construction*

Our task in deciding the issue presented in this appeal is one of statutory construction. The Court of Appeals in *Derry v. State*, 358 Md. 325, 335–36, 748 A.2d 478 (2000), recounted the following well-honored principles of statutory construction:

> As this Court repeatedly has made clear, the paramount goal of statutory interpretation is to identify and effectuate the legislative intent underlying the statute(s) at issue. The legislative intent of a statute primarily reveals itself, through its very own words. As a rule, we view the words of a statute in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood. If the words of a statute clearly and unambiguously delineate the legislative intent, ours is an ephemeral enterprise: we need investigate no further but simply apply the statute as it reads. Even so, we do not view the plain language of a statute in a vacuum. As we have often reiterated,

> > While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears.

(Internal citations omitted).

 "[T]his Court will 'neither add nor delete words in order to give the statute a meaning not otherwise communicat-

ed by the language used.' " *Harris v. Bd. of Educ.*, 375 Md.
21, 31, 825 A.2d 365 (2003)(citing *Blind Indus. v. Dep't of Gen.
Servs.*, 371 Md. 221, 231, 808 A.2d 782 (2002)). We "read
statutes in harmony, so that all provisions can be given
reasonable effect." *Yox, supra*, 380 Md. at 337, 844 A.2d 1151
(citing *Balt. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145,
157, 501 A.2d 1307 (1986)). Further, "[w]e do not interpret
statutes in ways that produce absurd results that could never
have been intended by the legislature." *Id.*

The Court of Appeals reiterated the following "well-settled"
and specific guidelines when construing provisions of the
Workers' Compensation Act (the "Act"), Maryland Code, La-
bor and Employment Article, Title 9 (1999 Repl.Vol., 2005
Supp.):

> As we have repeatedly emphasized, the Act is remedial in
> nature and 'should be construed as liberally in favor of
> injured employees as its provisions will permit in order to
> effectuate its benevolent purposes.' Thus, in interpreting
> the Act, we do not apply the canon of construction that a
> statute in derogation of the common law should be strictly
> construed. § 9–102(b). Moreover, all sections of the Act
> must be read together, in conjunction with one another, to
> discern the true intent of the legislature. Of course, we
> seek to avoid an interpretation which would lead to an
> untenable or illogical outcome.
>
> In construing the Act, as in construing all statutes, the
> paramount objective is to ascertain and give effect to the
> intent of the legislature. In interpreting the Act, we apply
> the following general principles. First, if the plain meaning
> of the statutory language is clear and unambiguous, and
> consistent with both the broad purposes of the legislation,
> and the specific purpose of the provision being interpreted,
> our inquiry is at an end. Second, when the meaning of the
> plain language is ambiguous or unclear, we seek to discern
> the intent of the legislature from surrounding circum-
> stances, such as legislative history, prior case law, and the
> purposes upon which the statutory framework was based.
> Last, applying a canon of construction specific to the Act, if

the intent of the legislature is ambiguous or remains unclear, we resolve any uncertainty in favor of the claimant.

This Court, however, may not stifle the plain meaning of the Act, or exceed its purposes, so that the injured worker may prevail. Similarly, the Court may not create ambiguity or uncertainty in the Act's provisions where none exists so that a provision may be interpreted in favor of the injured claimant.

*Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 472–73, 784 A.2d 569 (2001)(internal citations omitted)(quoting *Philip Elecs. N. Am. v. Wright*, 348 Md. 209, 212, 703 A.2d 150 (1997)), *superceded by statute on other grounds.*

### *Relevant Statutory Provisions*

Our primary review will be of the interplay between §§ 9–505 (Occupational disease) and 9–650 (Calculation of percentage of hearing loss). Although recognizing the risk of excessive minutiae, we nonetheless shall set out the pertinent provisions of §§ 9–505, 9–649–651, and 9–660:

### § 9–505. Occupational deafness.

(a) *In general.*—Except as otherwise provided, an employer shall provide compensation in accordance with this title to a covered employee for loss of hearing by the covered employee due to industrial noise in the frequencies of 500, 1,000, 2,000, and 3,000 hertz.

(b) *Short-term employer.*—An employer is not liable for compensation for occupational deafness under subsection (a) of this section unless the covered employee claiming benefits worked for the employer in employment that exposed the covered employee to harmful noise for at least 90 days.

### § 9–649. Scope of part.

A covered employee who suffers from occupational deafness shall be paid compensation in accordance with this Part VII of this subtitle.

### § 9–650. Calculation of percentage of hearing loss.

(a) *Measurement instruments.*—(1) Hearing loss shall be measured by audiometric instrumentation that meets the following criteria:

(i) ANSI 3.6–1996;

(ii) ANSI S3.43–1992; and

(iii) ANSI 3.39–1987 or any ANSI standard that supersedes the previous calibration or measurement criteria.

(2) Measurements shall be conducted in a sound room that meets the ANSI 3.1–1991 criteria for maximum permissible ambient noise for audiometric test rooms.

(3) Behavioral psychoacoustic measurements shall be obtained with instrumentation that utilizes insert earphones, as referenced in ANSI 3.6–1996.

(4) Electrodiagnostic measurements such as auditory evoked potentials, acoustic emittance measurements, or distortion product otoacoustic emissions may be obtained to determine the nature and extent of workplace hearing loss.

(5) Audiologic results shall be used in conjunction with other information to evaluate a claimant's compensable hearing loss.

(b) *Calculation–Average thresholds of hearing.*—(1) The percentage of hearing loss for purposes of compensation for occupational deafness shall be determined by calculating the average, in decibels, of the thresholds of hearing for the frequencies of 500, 1,000, 2,000, and 3,000 hertz in accordance with paragraph (2) of this subsection.

(2) The average of the thresholds in hearing shall be calculated by:

(i) adding together the lowest measured losses in each of the 4 frequencies; and

(ii) dividing the total by 4.

(3) To allow for the average amount of hearing loss from nonoccupational causes found in the population at any given age, there shall be deducted from the total average decibel loss determined under paragraphs (1) and (2) of this subsection one-half of a decibel for each year of the covered

employee's age over 50 at the time of the last exposure to industrial noise.

(c)(1) If the average hearing loss in the 4 frequencies determined under subsection (b) of this section is 25 decibels or less, the covered employee does not have a compensable hearing loss.

(2) If the average hearing loss in the 4 frequencies determined under subsection (b) of this section is 91.7 decibels or more, the covered employee has a 100% compensable hearing loss.

(3) For every decibel that the average hearing loss exceeds 25 decibels, the covered employee shall be allowed 1.5% of the compensable hearing loss, up to a maximum of 100% compensable hearing loss at 91.7 decibels.

(d) *Binaural percentage of hearing loss.*—The binaural percentage of hearing loss shall be determined by:

(1) multiplying the percentage of hearing loss in the better ear by 5;

(2) adding that product to the percentage of hearing loss in the poorer ear; and

(3) dividing that sum by 6.

(e) *Amplification device; bone conduction thresholds.*—(1) In determining the percentage of hearing loss under this section, consideration may not be given to whether the use of an amplification device improves the ability of a covered employee to understand speech or enhance behavioral hearing thresholds.

(2)(i) In determining a workers' compensation claim for noise-related hearing loss, audiologic data shall use both bone conduction and air conduction results.

(ii) If a conductive loss is present, the bone conduction thresholds for each ear, rather than the air conduction levels, shall be used to calculate a claimant's average hearing loss.

§ 9-651. **Extent of Liability.**

(a) *In general.*—Except as provided in subsection (b) of this section, an employer is liable for the full extent of the occupational deafness of a covered employee if:

(1) the employment of the covered employee by the employer has contributed to any extent to the occupational deafness of the covered employee; and

(2) the employer otherwise is liable under this section and § 9–505 of this title.

(b) *Limitation on liability.*—An employer is liable only for the part of the deafness attributable to the employment by the employer if the employer establishes by competent evidence, including the results of a professionally controlled hearing test, the extent of the deafness of the covered employee that existed before exposure to harmful noise in the employment of the employer.

### § 9–660. Provision of medical services and treatment.

(a) *In general.*—In addition to the compensation provided under this subtitle, if a covered employee has suffered an accidental personal injury, compensable hernia, or occupational disease the employer or its insurer promptly shall provide to the covered employee, as the Commission may require:

(1) medical, surgical, or other attendance or treatment;

(2) hospital and nursing services;

(3) medicine;

(4) crutches and other apparatus; and

(5) artificial arms, feet, hands, and legs and other prosthetic appliances.

(b) *Duration.*—The employer or its insurer shall provide the medical services and treatment required under subsection (a) of this section for the period required by the nature of the accidental personal injury, compensable hernia, or occupational disease.

(c) *Award or order—Not to reopen case or change previous award.*—Except as provided in § 9–736(b) and (c) of this

title, any award or order of the Commission under this section may not be construed to:

(1) reopen any case; or

(2) allow any previous award to be changed.

## ANALYSIS

■ We are mindful of the caution by the Court of Appeals in *Derry, supra,* that "our construction of the ... statutes involved in the present case need not venture far beyond [their] text. Despite a theoretically arguable ambiguity ..., we believe the plain language ... unmistakably manifests its legislative intent." 358 Md. at 336, 748 A.2d 478. Put another way, the language of the contested provisions, §§ 9–505 and 9–650 in particular, is sufficiently clear that an inquiry into legislative history is unnecessary. *Cf. Crawley v. Gen. Motors Corp.,* 70 Md.App. 100, 106, 519 A.2d 1348 (1987).

Appellant concedes that he does not meet the audiological standards outlined in § 9–650. But, he argues, § 9–650, when considered with §§ 9–505 and 9–660, entitles him to an award of the costs of medical treatment, *i.e.,* hearing aids, rather than monetary benefits, "since those costs are not considered compensation." Appellant argues that § 9–505 is, in essence, *sui generis,* in that it "states that a claim for occupational hearing loss is a compensable disease if one suffers hearing loss in the requisite frequencies." And that "[i]t is undisputed that [appellant] has met the criteria for 'occupational deafness' under this section [§ 9–505]." Further, by applying § 9–660, appellant seeks to distinguish medical services benefits from entitlement to monetary compensation under the more specific technical requirements of § 9–650.

Appellee responds that appellant does not become eligible for *any* benefits (medical or otherwise) until a claim is deemed compensable, and that there is no support for appellant's argument that § 9–505, standing alone, creates an entitlement to benefits. Appellee maintains that, although §§ 9–505 and 9–650 are codified in different subsections of the article, the sections of the Act are inseparable for purposes of benefit

analysis. Appellee posits that appellant merely seeks to excise and apply one provision of the Act, for his benefit, in contradistinction to the whole.

Although dealing with the question of when a claim for occupational deafness accrues, the observations of the Court of Appeals, in *Yox, supra,* 380 Md. at 328, 844 A.2d 1151, are instructive.

[A]n occupational deafness disablement occurs when the hearing loss *becomes compensable under § 9–650.* A claim for workers' compensation benefits based on occupational deafness must therefore be filed within two years from the time the hearing loss *reaches that level of compensability* and the employee has actual knowledge that the loss was caused by his/her employment.

(Emphasis added).

Describing the former incantation of the Act (the "1967 statute"), Article 101, § 25A, the Court noted that, under the legislative scheme, " 'occupational deafness' would be compensated 'according to the terms and conditions of [25A].' *Section 25A then set forth a technical set of criteria for when occupational deafness would be compensable." Id.* at 334, 844 A.2d 1151. Additionally, the *Yox* Court noted that the 1967 statute was "now spread between [§§ ] 9–505 and 9–649 through 9–652," *id.* at 337, 844 A.2d 1151, and that these statutory changes resulted in an additional set of circumstances under the current Act:

In 1991, as part of the general code revision process, art. 101 was repealed, and its provisions, constituting the workers' compensation law, were recodified as title 9 of the Labor and Employment Article. The new article split the former provisions between subtitles 5, dealing with the entitlement to compensation, and 6, dealing with benefits.

\* \* \*

Section 9–505 deals specifically with occupational deafness-hearing loss due to occupational disease rather than accidental injury. The current version requires an employ-

er to provide compensation "in accordance with this title" to a covered employee for loss of hearing due to industrial noise in the frequencies of 500, 1,000, 2,000, and 3,000 hertz.

In *Crawley, supra,* 70 Md.App. at 107, 519 A.2d 1348, we held that the legislature intended to make occupational hearing loss compensable without regard to "disablement." In so holding, we stated that the legislative intent of the 1967 statute was "not only *'to provide technical criteria for measuring occupational loss of hearing* but also to make such loss compensable without regard to inability to work or loss of wages." [4] *Id.*

Appellant's argument essentially hinges on his claim that the placement of § 9–505 within the statutory scheme is meaningless, as it currently exists, in light of the way in which various provisions were separated and reassigned in the recodification process, as we have detailed, *supra.* We are satisfied, however, that the language of § 9–505, in conjunction with the language of the Act as a whole, indicates otherwise. *See Breitenbach, supra,* 366 Md. at 472–73, 784 A.2d 569.

The language of § 9–505 suggests that it does not exist in a vacuum and that its terms are qualified through the definitions contained in other subsections within the Act. As noted, title 9 codifies the entire Act and § 9–505 clearly states that, "[e]xcept as otherwise provided, an employer shall provide in accordance with this *title* . . ." Section 9–505 is placed within subtitle 5, "Entitlement to and Liability for Compensation," whereas §§ 9–649—9–652 are placed in subtitle 6, "Benefits." Within subtitle 6 is the relevant part VII, entitled "Occupational Deafness." The descriptive word "title" as used in § 9–505 clearly refers to the entire Act, which includes subtitle 6, wherein is set forth the specifics underlying compensability for

---

4. In dissent, Judge Garrity offered the following pertinent observation:
 *[T]he Legislature provided in § 25A much needed technical parameters in measuring binaural loss of hearing due to industrial noise exposure,* but did not eliminate the need on the part of a claimant to first show he or she was "actually incapacitated" by suffering some disablement, . . .
 *Crawley, supra,* 70 Md.App. at 111, 519 A.2d 1348.

occupational deafness. Given this, the language of § 9–505 leads a reasonable reader to conclude that it was not intended as a stand-alone provision; in fact, a reasonable interpretation leads to the opposite conclusion.

The language of § 9–505 is much too broad to function independently and serve as the sole basis for compensation, medical expenses, or otherwise. Section 9–505 provides no criteria other than "loss of hearing by the covered employee due to industrial noise in the [specified] frequencies . . ." Were that to be the whole of the test, nearly every employee of a certain age, at every task, will have suffered a compensable disablement. It is a fact that the human aging process is accompanied by some degree of hearing loss in a substantial percentage of the population. To accept appellant's reasoning, our holding would entitle nearly every worker in an industrial setting to compensation in the nature of medical expenses, including hearing aids, even in the absence of a § 9–650 calculation of occupational hearing loss. Under that scenario, the § 9–650(b)(3) provision, providing for deduction for "the average amount of hearing loss from nonoccupational causes to be found in the population at any given age" would be rendered meaningless.

Under appellant's formulation of § 9–505, it is equally unclear how hearing loss in the requisite frequencies would be measured. Section 9–650(a) provides specific audiometric instrumentation criteria; § 9–505 provides no similar requirement. The specificity of § 9–650(a) would be illogical and inconsistent with the purposes of the Act when measured against the absence of any such requirements in § 9–505, if the latter provision were meant to stand alone. The statute is, by necessity, complex. Hearing loss, as contrasted with other industrial injuries, can be determined only by the use of sophisticated testing. Hence, the considerable detail of the statute. Other industrial injuries or losses are more easily determined and observed. For example, the loss of a limb or other scheduled member can be readily attributed to an industrial accident. An employee who reports to work with all ten fingers and leaves with only nine, presents an easily

adjusted claim in terms of causation. In contrast, few employees, if any, are tested for hearing loss until such loss is suspected. Employers do not, therefore, know when an employee reports to work if that employee suffers from a measurable hearing loss and, even more, whether such loss, if any, is work-related. We conclude, therefore, that entitlement to compensation for occupational deafness must be predicated upon the claimant's having a degree of hearing loss as established within the specified technical parameters § 9–650.

Lastly, we consider the purpose of § 9–505 within the overall operation of the Act. In our quest to give every portion of the Act meaning, we find that § 9–505 has meaning separate and apart from §§ 9–649—9–652, but not the meaning appellant ascribes. Section 9–505 defines occupational deafness and provides that the condition itself is compensable, though, as we have described, this provision is qualified by §§ 9–649—9–652.

In 1961, in *Belschner v. Anchor Post Products, Inc.,* 227 Md. 89, 175 A.2d 419 (1961), the Court of Appeals held that a worker still performing his regular duties without a loss in wages was not disabled and could not recover benefits based on hearing loss. In response to *Belschner,* the legislature enacted what is now § 9–505. As this Court noted in *Tru–Rol v. Yox,* 149 Md.App. 707, 715, 818 A.2d 283 (2003), in *Crawley,* "we adopted the position taken by Crawley that section 9–505 was enacted in response to *Belschner."* Thus, without that legislative enactment, we would be left with only the technical requirements that undergird a compensable hearing loss, but with no pronouncement that occupational deafness is, in fact, a compensable condition.

Without § 9–505, the Commission and the courts would also have been less able to assess the scope of compensability as defined by the *Crawley* Court, which made such losses compensable without regard to a claimant's inability to work, or lack of a loss in wages. *See Crawley, supra,* 70 Md.App. at 107, 519 A.2d 1348. In essence, § 9–505 serves as the foundation which permits compensable occupation hearing loss, in

that it provides that occupational deafness due to industrial noise in certain frequencies is, in fact, a compensable condition without regard for the disablement threshold applicable to other conditions. Meeting the requirements of § 9–505 is a necessary, but not sufficient, predicate for establishing what could become a compensable workers' compensation claim when disablement reaches the levels prescribed in § 9–650. In sum, § 9–505 recognizes that occupational deafness is a compensable condition, and that one who suffers occupational deafness is, therefore, entitled to compensation benefits if he or she meets the requirements of the provisions of Part VII of subtitle 6, and particularly, § 9–650.

Although the courts seek to resolve uncertainty within the Act in favor of the claimant, we do not go so far as to create a process by which an employee may be compensated contrary to the plain meaning of the Act. *See Breitenbach, supra,* 366 Md. at 473, 784 A.2d 569. Further, "the Act reflects the Legislature's considered judgment as to the appropriate allocation of resources between employers, employees, and the taxpayers of this State." *Philip Elecs. N. Am., supra,* 348 Md. at 228, 703 A.2d 150; *see also Del Marr v. Montgomery County,* 169 Md.App. 187, 900 A.2d 243 (2006).

The material facts before the circuit court were undisputed, and under those facts the court's judgment was correct as a matter of law.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**